yes good morning may please the court the district court based we get your name for the record sir I beg your pardon I'm John Weston appearing for appellant dream palace thank you the district court predicated its determination that the appellant was entitled to only limited fees on its erroneous conclusion that appellant had obtained only de minimis relief in the proceeding ultimately the court essentially awarded 5% based on that finding of the actual attorneys fees that had been generated below and paid for by the client and ignored totally the fact that plaintiff or an appellant in its motion for attorneys fees had already made voluntary reductions of approximately 40% as indicated by Hensley and as sanctioned by this court in Moreno the court was simply wrong in its determination that there had been no significant success earned by appellant and frankly on that basis abused its discretion in refusing to award greater fees I asked the court to consider three elements of what the success was that were obtained by the appellant if the legislation that was challenged amongst other things provided for a new adult entertainment permit there was no provision for protection for existing businesses during the potentially lengthy administrative and judicial appeal the district court invalidated that provision and clearly definitively initiate judgment in connection with that secondly I'm not sure what exactly is achieved by that it means during the pendency of the litigation you fend off the application of the law but that suggests benefit in extending litigation not in extending on a legal issue no not necessarily litigation your honor what this permitted was the business to be able to remain open while it pursued its appropriate administrative and judicial relief such that at the end of the day if it won the victory at one would not be pyrrhic it would be real because the business would still be alive as opposed to having been closed well but at the end of the day it really didn't win very big in the business didn't close as a well it didn't win very big on number one and we'll get to number two and number three but number one simply says we stay open while the litigation is pending when the litigation ended the business didn't close so I don't see how there's a big victory here not maybe numbers two and number three give me something but number one doesn't give me much at all may follow up on Judge Clifton's comment I have looked with interest at what I will call exhibit D which I believe you folks provided which discusses in some detail the winning and losing claims and issues set forth in the case it's clear that you have done a lot achieved a lot for your client but as you know when it comes to the change in position situation it has to be judicially sanctioned I'm not sure how many of these claims that you outline in exhibit D were actually sanctioned by the district court as opposed to something that the county did as a result of the litigation does that make any difference under the case law well it would your honor to the extent obviously that this court and and both your honor and Judge Smith had been recently active in panels addressing Buckhannon and the requirement of a judicial determination indeed we have we read there was some assiduousness but with respect to those points we prevailed on very specific judicial determinations of invalidity one with respect to and under other circumstances we might debate the significance of point one but it was a clear hold if this would be helpful to me if you have exhibit D available it would be helpful to me for you to refer to which one you're talking about so I can put a little checkmark by it as we go down these you know what I'm talking about so this is the charts of winning and losing claims and issues it's it's it's roughly three what's two and a half pages in what appears to be a kind of a table yes you don't want to talk about yes I do your starting on those the winning claims can you we go down these quickly which ones involved court approval and represented to change a position on the part of the county the second one claim for injunction preventing enforcement of adult business licensing requirement the court did approve that right yes okay that was the district court right the claim for injunction to present prevent enforcement of prohibition on presenting performances involving specified sexual activity that's the one on the top of the second yes and that was this court and of course this is an erotic dance club so that the nature of the X of what was granted by the Ninth Circuit went to the very essence the raison d'etre of the performances offered in the business how about the second one on that page and then the claim for injunction preventing compelled disclosure of confidential information that was critical this court issued an injunction against permitting such disclosure because the permit requirement gave the county lots of private information about the entertainers and the managers that they were they the managers well there was the Court of Appeals that gave its imprimatur this court other than the district court right yes no this court your honor but that was critical right right they had threatened to leave and here we would have had a live entertainment business which was not going to be able to entertain how about the third one on that page the claim for injunction preventing dancers from having to wear their ID cards that was grant granted as to the entertainers by the district court and declared moot by this court in light of this courts in joining the disclosure of confidential information in other words conjure up an unusual version of pasties actually well it might but I don't point taken although I don't think the county intended that to be I think I had to be worn above the waist but not in particular areas I don't think it was relevant to the managers who were totally closed to begin with I understand how about the fourth one on that page the claim for injunction for preventing managers from having to wear their ID cards that was declared moot by this court in light of its injunction vis-a-vis the confidentiality provision but essentially it so that's tied from your perspective that's tied to the permit requirement for managers and dancers remained in effect but the purpose of making that challenge was clearly a related claim under Hensley in that we attacked the permit requirement because we were concerned about the confidentiality the permit requirement is what required the providing of the very information which the lack of confidentiality made available to the public and so it clearly from our perspective under Hensley would have been a related claim what did you seek to accomplish with the permit requirement we sought to have the dancer and manager permit requirement invalidated such that your honor the you didn't get it invalidated we what you got was they don't they don't have to disclose it to the public is that why I understand that right what we got was not that we did not have to disclose there was no potential disclosure to the public of the confidential information obtained by the county solely through the permit process that's that's what you got what you asked for was an it was a complete invalidation of the permit requirement yes we did but clearly your honor with all respect under Hensley that the challenge to the permit requirement for purposes of guaranteeing the privacy of the very highly confidential information address telephone number and so forth was clearly a related claim under Hensley well related or unrelated you asked for the moon and the stars and you wound up getting getting Cleveland when it comes to the permit isn't that no not quite we asked one of the whole thing invalidated we asked you wound up getting they don't have to disclose it to the public is the river still burning we we asked to go to the moon either by airplane or by train and we got there by airplane and the fact that we sought to get there by train and the court did not allow that does not invalidate under Hensley our entitlement to efforts in pursuit of similar relief by by different theories that is the absolute linchpin of what Hensley is and it was the linchpin of what the of what congressional intent was in grant in grant in adopting 1988 that counsel should be entitled to compensation for reasonable efforts in furtherance of the claims for benefited the clients I see you've got about half a minute left did you want to reserve I would like to thank you Good morning, Your Honors, and may it please the Court. My name is Scott Boehm, and I am appearing today on behalf of Maricopa County and I guess technically in defense of Judge McNamee, our presiding judge in in Arizona. I think Mr. Weston hit the nail on his head with this presentation is that the fundamental disagreement between Dream Palace and Maricopa County's position in the district court and this court that Judge McNamee understood and accepted was the degree of success in the trial court. Let's assume for a second that Judge McNamee thought that they asked for the world and only got a small portion. And as I understand it, what he purported to do then was to only award fees for where they where they prevailed. What I don't get about Judge McNamee's order is he seems to have disallowed any fees for the time spent in district court on the issues in which they were dealt. He only awarded fees for time spent in the court of appeals where they prevailed. Do I have the fact right? I think, if I understood you correctly, my understanding from Judge McNamee's ruling is that he took the lodestar figure, and in light of care and your personal opinion in the Cummings case that we cited in our brief, went through the Hensley analysis and started throwing out stuff that they didn't prevail on and did he throw out stuff that they did prevail on ultimately, but he didn't award district court time, but he did award court of appeals time? They suggested that to him. I'm asking you if that's what happened. I don't think he did, Your Honor. I think what Judge McNamee did in that regard was, and this was specifically addressed in the motion to amend. They thought, they being Dream Palace, suggested to Judge McNamee exactly what you're suggesting, is that, Judge, you may have overlooked the time that we spent in the district court on the two issues that the Ninth Circuit gave us. If they are right about that, if they are correct about that, then Judge McNamee, as a matter of law, would be wrong. Is that true? He would have no basis to exclude the time they spent in district court on a winning claim. Well, I think he would have a basis under Hensley. Under Hensley, based upon going through the care factors, he could go through and decide when there is de minimis, and de minimis is my word. What sense would it make to say, I'll give you the time you spent in the court of appeals on these claims, but not the time you spent in the district court on those self-same claims? What sense would that make? I think the sense of it is that the court is allowed, the district court is allowed to take a look at the overall litigation and determine. If he says, I'm not going to give you the claims you lost, but if he says, I'll give you the claims you won, but only in the court of appeals, not in the district court, I don't understand the logic of that. I think under Hensley, he gets to make that call. I mean, the judge. Does he use his trick elbow? I mean, there's got to be some rationale for that. Why would you say, I'll give you your appellate time, but not your district court time? His explanation in the motion for reconsideration, or in the motion to alter or amend, was that he looked at that and decided that in light of everything, of the whole scheme of the time allowed, that he thought that was unreasonable. But counsel, I mean, let's be realistic about this. Tell me if I'm wrong about this. The county had a lot of political pressure about this particular business and businesses like it. It wanted to put them out of business. These folks indicated, hey, you can't do that constitutionally. They fought tooth and nail to protect their constitutional rights and largely prevailed in the sense that they were able to continue doing business. Now, with some refinements, just like they were doing before, because that was their constitutional right, why didn't they overwhelmingly prevail in this case? The reason that we're --. Well, first of all, let me disagree with part of your premise there. Okay. The county was not intending to put anyone out of business. Why not? The county adopted this ordinance in an effort to regulate SOBs, sexually oriented businesses, in order to combat and negate the negative secondary effects that those are universally found to generate. And in so doing that, they adopted, and now I'm starting to get. I mean, I appreciate the graciousness of your words, but doesn't that get back to the initial point that I made? The county felt that what these sexual oriented businesses, which is kind of delicately, the initials on that aren't good, but what they were trying to do was apparently respond to a political outcry of some kind. And they wanted to either eliminate or largely eliminate this threat to the community as they viewed it. Isn't that a fair statement? Yes. Reduce or eliminate as many negative sexual effects as possible. So in this case, these folks exercised their constitutional rights. And they said, hey, wait a minute. Under the Constitution, we have certain rights of expression here. We can do certain things. And they fought in the district court and they fought in the court of appeal. And at the end of the day, after all of the strum and drung, they are able to continue to do largely what they did before. And my question to you is, why is that not, from a 1983 perspective, an overwhelming victory? Because they're not allowed to do largely what they could do before. Okay. What can't they now do that they were able to do before? They have to have a permit. Well, that's a big deal. They have to have a license. It keeps people who are not qualified out of the ownership and management of these businesses. Okay. That doesn't really change the operation of the business in terms of what the customers see, right? The day-to-day operation of these has changed dramatically in terms of stage heights, hours of operation, touching of dancers, tipping of dancers, regulation of dancers. You go into these businesses now under the statute, under the ordinance, it's completely or I don't know whether it is. It should be completely different in terms of the day-to-day operation. If the universe was 100 percent, if everything they wanted was 100 percent, what did they get out of that 100 percent? From this litigation? By my view, less than 5. Less than 5 percent? Part of the problem is Judge McNamee never quantified it by percentage, did he? No. What he did is he went through and I think what he was supposed to do under Hensley and Cummings and I think Benton, the other case from this Court that talks about it, is he went through and analyzed what they won and what they lost on an issue or claim basis. Now, keep in mind, Judge McNamee has been on this case since 1997 when it was first filed under the original statute. And I'll agree with you, Judge, the first statute that we passed, or I say statute ordinance, was a quick ordinance pretty much pilfered from the city of Scottsdale's ordinance. Right. So after they filed the original complaint, which is the first go-round on this, if you will, that is when we went and completely amended the ordinance and adopted and negated a lot of their issues. Let's follow up on Judge Silberman's comment. If you take the portion of the case that was won at the court of appeals, and you take the same issues that were won at the court of appeals, then out of that 100%, then what does it get to be? That was my answer. That gets you to five. Five percent? They won four issues, four minor issues. But understand that you can have something, a gnat on the back of an elephant's back that may be won, and you may have one as big as the elephant's leg. The reality is that the key issues in this were what they fought over, isn't it, that they took up to the court of appeals? The key issues in this were overwhelming defeats. They got their butt kicked, and I'm not patting myself on the back because Maricopa County You don't use that because we're dealing with an SOB. No. And I'm just saying that the ‑‑ I almost said Cleveland. Maricopa County came late to the sex regulation business. So by the time this ordinance was passed and then amended, there were pattern ordinances throughout the country and cases from this court, Colacurcio was one of the first from this court, long before we got involved. So neither the plaintiffs nor us, Maricopa County, me personally, who had been defending this from the get‑go, reinvented the wheel. All we really had to do was research the cases that this court relied on in its principal ruling and the cases that Judge McNamee relied on. Everything was pretty much cut and dried. There were some issues that the circuits were divided on, but there was very, very little that was novel, that was, in frankly, any dispute whatsoever. Well, if that's the case, then why did they have to go to the court of appeals? What was it, twice? Yeah. And they won both times, right? No, they didn't win. I mean, they won these two little issues at the court of appeals. We didn't cross appeal the two that Judge McNamee ruled. Now, from your perspective, what did they win at the court of appeals? They won at the court of appeals. The ordinance has a confidentiality clause that says the items or the disclosures made pursuant to this ordinance shall be kept confidential. Okay. That's a really big deal, isn't it? I mean, if you're talking about workers in the sex trade that maybe don't want their names and their photos and their addresses up on the Internet, that's a pretty big deal, isn't it? But if you let me finish, I don't mean to be smart about it, but that was in the ordinance. But then there was a comma that said, subject to the public records laws of Arizona. That must have been comforting. I think it was, because, I mean, we argued, I mean, to Judge McNamee, we explained we went through the whole Arizona public records law analysis, which the Ninth Circuit didn't get to. So we essentially took that phrase out, put a period where there was a comma. The other thing that they prevailed on in the Ninth Circuit was the definition of specific sexual activities that were precluded under the statute, under the ordinance. And it included, you know, such things as excretion on stage, live sex acts. And it also had simulated sex acts. And the Ninth Circuit said that simulated didn't give them enough of an indication of what was or not prescribed. And I think it was vague. And it was vague, right? I'm sorry? And it was vague? No, they didn't really say it was vague. I don't think they decided on vagueness. But for whatever reason, they said, go back and recraft it, because, again, there were a number of other similar statutes upon which this same language had been approved. So we went ahead and did that. That's what they want up here. A comma where there was a period. We already had the confidentiality clause. And we rewrote the statute. I mean, the amendments took very, very short time. And at the same time, we cured the two defects that Judge McNamee had found, gave them a temporary permit, and we – I forget what the fourth one was, frankly. Why don't you wrap up, if you would? I don't really have anything more, Judge. Great. Thank you. I think the brief went through it. May it please the Court. We would have had no dancers. We would have had no live adult entertainment. As this Court in its substantive opinion noted, this is a total ban on nude and semi-nude dancing in everything but name. And indeed, the county concedes as much. So this is a regulation that went to the entire heart of what the business was all about, number one. Number two, we would have had no dancers, because although it only took perhaps two words to eliminate it in the ordinance, the lack of confidentiality meant that the home address of every adult entertainer and every management person was available to any citizen who asked for it. So we would have had no dancers, and if somehow there were, they couldn't have done the very dancing which was the raison d'etre of the business. And more importantly with respect to that, on the license side of things, our client is a licensed nonconforming use. If it had been closed for any tangible period of time, it would have been deemed to have been – to abandon the use and would have lost its very, very location. And finally, the point that I would make with respect to this is that we did everything right in this case, as we pointed out in the brief. Before we filed, we came to the county and we said, these are problems. We then had a meeting with them, and we laid it out, and they said write a letter. I wrote an 18-page letter to them in which I laid out the entirety of what the problems were, including their totally ultra-virus ordinance that they had adopted initially because it was absolutely not sanctioned by the enabling legislation. At no time did the county say, you know, you're right, don't worry about this, we'll fix it. They made us go the limit to it. They made us go for a preliminary injunction, and two minutes before we were about to argue the preliminary injunction, even though they knew that they had persuaded the legislature to change the enabling legislation so that the problem would have solved, they found at that juncture they said, okay, we'll stipulate to a preliminary injunction. They made us do everything to fight because the county board of supervisors would never stand up and say, yeah, to an adult business, you were right, we're weak, you're wrong. Now, what this sounds like, what this is like is that the defendant, after being convicted for murder at time of settlement, says, please spare me. I'm an orphan. You must protect me. The county caused virtually all of the time in this case. They called the tune, and now they've got to pay the piper. They cannot have it both ways, as the Court indicated in the previous case. Thank you. I didn't want to take your argument time, but I do have one specific question about your brief. Yes, Justice. And that is you requested and obtained special permission from the Court to file an overlong brief up to 21,000 words. You filed a brief which you report is two words short of that. Does that word count include the additional exhibits attached to the brief? It does not include the exhibits, Your Honor. It's something else. Speaking for myself, I think this brief is in gross violation of the rules. Well, we apologize if ---- A, personally, it didn't need 21,000 words. It didn't need 21,000 words plus a whole lot of exhibits that are really created by you for purposes of argument. It was not the intention, Your Honor. It was the intention to try to be helpful in a matter where, because of the county's position and the county's failure to object throughout this case to specific expenditures of time, we sought to do our jobs both with respect to the Court and with respect to our client. And if we misunderstood or if we offended the Court, obviously that was not our intention. I thank the Court for its attention. Thank you, gentlemen. The case argued is submitted.
judges: Silverman, Clifton, Smith M.